■ In the Matter of KENDALL J., a Person Alleged to be a Juvenile Delinquent, Appellant. [807 NYS2d 330]—

Order, Family Court, New York County (Susan R. Larabee, J.), entered on or about November 3, 2004, which adjudicated appellant a juvenile delinquent, upon a fact-finding determination that he committed an act which, if committed by an adult, would constitute the crime of sexual abuse in the first degree,

---

and placed him with the Office of Children and Family Services for a period of up to 18 months, unanimously reversed, on the law, without costs, the order vacated, and the matter remitted to Family Court for a new fact-finding hearing and determination.

The Family Court Judge erred when she struck the entire testimony of respondent's principal witness, Dr. Daniel. Dr. Daniel, a senior attending physician at St. Luke's Hospital, interviewed the seven-year-old complaining witness, Sabrina G.-J., in the early morning on August 5, 2004 after Sabrina and her mother, Tiffany G., arrived at the hospital by ambulance.

Sabrina told Dr. Daniel that Kendall (appellant), her fifteen-year-old cousin, put some Vaseline on his finger and then tried to touch her buttocks and vagina. Dr. Daniel asked Sabrina whether Kendall tried to pull down her pants or underwear. Sabrina said, "No." When asked whether Kendall tried to put his penis in her vagina or her mouth, Sabrina also said "No." "[N]othing of that sort happened," Sabrina told the doctor. When asked specifically about penetration in the rectum, Sabrina "told me that there was no penetration in the rectum." In fact, there was no touching by Kendall at all, not even with his finger, according to the account Sabrina gave to Dr. Daniel.

Defense counsel's offer of proof was that Sabrina told Dr. Daniel that Kendall's actions occurred on one of the days during her last visit to her grandmother's house, where Kendall resided. At one point, before being cut off by the prosecutor's objection, Dr. Daniel stated, when asked what Sabrina had said about when the alleged abuse occurred, "She actually told me, 'when I was there for the last time at the grandmother's house, that . . . .' " Moreover, when asked when it happened, Sabrina told Dr. Daniel "The last time I was at [my] grandmother's house." The nurse's notes indicated that the alleged abuse had happened in June; Sabrina's mother told the nurse it happened in the end of June; and Dr. Daniel got from Sabrina's mother the specific dates of between June 25 and June 28.

Tiffany G., Sabrina's mother, testified that on Friday, June 25, 2004, her sister Erica took Sabrina and her other child, her five-year-old son Corey, to the home of Sabrina's paternal grandmother. Erica and the two children remained there until Monday, June 28, when Tiffany G. picked them up. At about 1:15 A.M. on August 05, 2004, Tiffany G. returned home from work. Sabrina, who was awake but in bed, then knocked on the bathroom door. Crying, Sabrina told her mother about acts allegedly committed against her by Kendall. Sabrina did not speak in terms of the dates June 25 through June 28, but she told her

mother that Kendall had committed the acts the last time she, Sabrina, went to her grandmother's home. June 25 through June 28, according to Tiffany G., "was the last time she spent the night" at her grandmother's house.

Tiffany G. then took Sabrina to her grandmother's house, arriving at about 2:30 A.M. Tiffany G. called the police before she got to the apartment building where Sabrina's grandmother lived, and Tiffany G. "let [her] daughter" tell the police what Sabrina had told her. Sabrina also told the police that Kendall committed the acts during the last weekend she was at her grandmother's house. After speaking with police officers, Tiffany G. and Sabrina went to the hospital.

Although Sabrina's testimony about what Kendall allegedly had done to her differed markedly from the account that Dr. Daniel testified she gave, she also testified that the incident occurred during the weekend of June 25, 2004.[1] Specifically, she testified it had occurred the last time she was at her grandmother's house with her brother and Aunt Erica, and on the last night of that weekend. She recalled going to her grandmother's on Friday with her Aunt Erica and her brother after having cake on account of her brother's graduation. She testified as well that her mother had picked her up at her grandmother's house on Monday June 28. Sabrina also testified that she recalled the night she told her mother what Kendall allegedly had done that weekend, and recalled going to the hospital that same night and talking to a doctor about what had happened.

After defense counsel eventually elicited from Dr. Daniel the account given to her by Sabrina,[2] the prosecutor moved to strike Dr. Daniel's entire testimony. The basis for her motion was that Dr. Daniel's testimony did not establish that Sabrina was relating to Dr. Daniel an incident that had occurred during the dates June 25 through June 28. Rather, as Dr. Daniel had acknowledged, Sabrina merely related to Dr. Daniel an incident that occurred the last time she was at her grandmother's house. This was critical, the prosecutor argued, because defense counsel had elicited testimony on cross-examination of Sabrina to the effect that after the alleged sexual assault by Kendall during the weekend of June 25 to June 28, Sabrina recalled again visiting her grandmother and asking if she could spend the night. Ac-

---

1. Sabrina testified on August 19, 2004, less than two months after the weekend in question and some two weeks after being interviewed and treated by Dr. Daniel.

2. As discussed below, the prosecutor repeatedly interposed baseless hearsay objections to defense counsel's efforts to elicit Sabrina's statements to the doctor.

cordingly, the prosecutor contended that Dr. Daniel's testimony about what Sabrina had told her was irrelevant because Sabrina had been relating to Dr. Daniel a different incident, and thus there was no inconsistency between Sabrina's trial testimony and the account she gave to Dr. Daniel about the assertedly different and subsequent incident.

Unfortunately, the Family Court judge credited the prosecutor's wholly specious argument. In the first place, as Kendall correctly argues, even if there were ambiguity in the record about whether the incident Sabrina related to Dr. Daniel occurred during the weekend beginning on June 25, Dr. Daniel's testimony should not have been stricken. Rather, that ambiguity would affect the weight to be given Dr. Daniel's testimony about Sabrina's inconsistent statement and not its admissibility (*see e.g. People v Wise,* 46 NY2d 321, 327 [1978] ["In case of doubt, therefore, the balance should be struck in favor of admissibility (of prior statements claimed to be inconsistent), leaving to the jury the function of determining what weight should be assigned the impeachment evidence"]).

Second, and more important, it was not defensible for the Family Court judge to have essentially ruled as a matter of law that Sabrina had related to Dr. Daniel a different incident. Indeed, it is not reasonable to think that Sabrina was talking to Dr. Daniel about some other incident. Sabrina had just informed her mother about the incident that had occurred on the weekend beginning on June 25, and her mother (all but immediately) took her to the hospital precisely because of that report. Not only was there nothing in Dr. Daniel's testimony to indicate that Sabrina was relating a different incident, Dr. Daniel testified that Sabrina had told her it had happened the last time she was at her grandmother's house, the nurse's notes indicated it had happened in June and Sabrina's mother pinpointed for her the specific dates of between June 25 and June 28. Sabrina's mother was present for part of the interview and it makes no sense to think she would have said nothing if Sabrina informed the doctor about an incident different from the one that prompted her to take Sabrina to the hospital by ambulance.

Moreover, as defense counsel argued, Sabrina herself never testified that the incident occurred between the specific dates of June 25 to June 28, but instead she testified it had occurred the last time she was at her grandmother's house with her Aunt Erica and her brother. Yet, Sabrina's same (and understandable) failure to use the specific dates when she related the incident to Dr. Daniel was the critical predicate for the motion to strike. In addition, there was no testimony at all that sug-

gested that Sabrina had ever spent the night at her grandmother's house after the weekend beginning on June 25. Defense counsel elicited on cross-examination of Sabrina only that she remembered going to *visit* with her grandmother after the incident and *asking* her grandmother if she could stay overnight.[3] Significantly, and unsurprisingly, in making her motion to strike, the prosecutor never asserted that she had any evidence at all that Sabrina had spent the night at her grandmother's after June 28.

As discussed below, the court's error in striking Dr. Daniel's testimony cannot be considered harmless. First, however, because there must be a new fact-finding hearing, other errors committed by the court should be briefly addressed.

During Dr. Daniel's testimony, she stated that she initially interviewed Sabrina in the presence of her mother, Tiffany G. When Sabrina told Dr. Daniel that Kendall had "tried to touch her back and tried to touch her front," the mother then immediately answered "Didn't Kendall try to." Before Dr. Daniel could finish, the prosecutor objected and the court sustained the objection. The court ruled that what the mother said was irrelevant, and repeatedly directed Dr. Daniel not to testify about what the mother had said. Shortly thereafter, Dr. Daniel testified that she asked Sabrina whether Kendall tried to pull down her pants or underwear. At that point, she attempted again to relate something that Tiffany G. then said, but the court interrupted and barred her once again from testifying about statements made by Tiffany G. during the interview.

With evident frustration, Dr. Daniel—who had been trained in interviewing children regarding sexual abuse allegations—apologized, saying "I'm sorry, I just wanted to tell the mother that—you know, the Judge that I had asked the mother to step out of the room because she was giving all these leading questions . . . ." Again, the court interrupted and instructed Dr. Daniel just to testify about anything else that Sabrina had told her.

Defense counsel then asked whether there came a time when the mother left the room. Although Dr. Daniel answered affirmatively, the Judge sustained the prosecutor's objection to the next question asking her why Tiffany G. left the room, despite counsel's protest that it was relevant to the interview process. Eventually, however, counsel's persistence elicited Dr. Daniel's testimony that Sabrina was "a little bit less nervous

---

**3.** Sabrina knew that Kendall lived with her grandmother and this testimony, of course, was elicited in an attempt to cast doubt on Sabrina's claim that Kendall had sexually abused her in the recent past.

when her mother was not there" and "was giving me, like, more open answers."

As Kendall argues, the court should not have rejected defense counsel's correct arguments that what Tiffany G. stated to Sabrina in her repeated "leading questions" was not hearsay. Apart from the fact that Dr. Daniel's testimony raised the disturbing possibility that Tiffany G. may have coached Sabrina or even put words in her mouth, what Tiffany G. said manifestly was not being offered by Kendall for its truth. Rather, Tiffany G.'s statements were admissible because they were being offered for the state of mind of a person, Sabrina, who heard them (see People v Davis, 58 NY2d 1102 [1983]).

The court below erred as well in sustaining objections by the prosecutor to questions posed by the defense on cross-examination of Sabrina asking her about what she told the police and the doctor at the hospital. What Sabrina told the police and the doctor was plainly a proper subject of cross-examination and, particularly with respect to questions asking her what she told the doctor, obviously were intended to establish a foundation for Dr. Daniel's testimony.[4] If the court had not wrongly sustained the prosecutor's objections, it certainly is possible that Sabrina herself could have made it all the more clear that the incident she related to Dr. Daniel was the same one she testified about on direct examination. In any event, there was no basis in law for the court thus to have curtailed Kendall's right to confront his accuser. Relatedly, it also was error for the court to have refused to permit counsel to cross-examine Tiffany G. about whether Sabrina, around the time she told her mother about the incident with Kendall, would not let her touch her (apparently in the area of her vagina) when she was bathing her. Although counsel informed the court that police documents were the source of this information, the court dismissed the questioning as "completely speculative."

Even if the evidence against Kendall had been far stronger,

---

4. Although the court sustained the prosecutor's objections to the questions asking Sabrina what she had said to the doctor, the court advised defense counsel, in response to her request for a ruling, that she did have the right to bring in witnesses "who say she said about this weekend other things." Ironically, however, the court sustained numerous objections by the prosecutor when counsel then did go on to ask Dr. Daniel about what Sabrina had told her. The prosecutor even objected that the questions were improper because Sabrina had not testified about what she had told the doctor, disingenuously ignoring that her own objections had prevented Sabrina from so testifying. It appears, however, that through her respectful persistence counsel ultimately may have been able to elicit from Dr. Daniel a full account of what Sabrina said to her despite the prosecutor's objections.

the court's numerous errors could not be considered harmless. Respondent was found to have committed an act of sexual abuse solely on the basis of Sabrina's testimony. The crux of her testimony was that she woke up when Kendall was taking his penis out of her "butt." Although she testified he "put his penis inside me" and moved it back and forth some four or five times, she also maintained that he did not put his penis "in the hole" in her "butt." Although it did not hurt at all, Sabrina was crying; nonetheless, her brother and two young cousins (who were asleep in the same small bedroom) apparently did not wake up. She also testified that her pants and underpants were off because Kendall had pulled them down after he "got behind" her on the bed.

Notably, no medical evidence corroborated Sabrina's account. Although numerous other people, including Sabrina's grandmother and aunt were in the house that weekend, none of them testified on the presentment agency's case. If not implausible, Sabrina's testimony that Kendall committed the acts alleged in the presence of three other boys sleeping in the small bedroom at least was open to question. The only other person in the apartment who testified, Sabrina's grandmother, contradicted Sabrina's testimony that she told her grandmother what had happened the next day. Finally, the account Sabrina gave to Dr. Daniel was entirely inconsistent with her testimony. In striking Dr. Daniel's entire testimony, the court erroneously deprived Kendall of one his most potent lines of defense. For these reasons, the court's errors deprived Kendall of his right to a fair fact-finding hearing. Concur—Tom, J.P., Marlow, Ellerin, Williams and McGuire, JJ.